J-A11040-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2198 EDA 2021 |

Appeal from the Order Entered September 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001834-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: B.G.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: R.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2199 EDA 2021 |

Appeal from the Order Entered September 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000270-2021

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED JUNE 14, 2022**

R.W. ("Father") appeals from the orders terminating his parental rights to A.S. a/k/a B.G.S., born November 2019, ("Child") and changing Child's permanency goal to adoption. We affirm.

In November 2019, the Philadelphia Department of Human Services ("DHS") received a General Protective Services ("GPS") report alleging K.S.

("Mother") and Child tested positive for cocaine and opiates at Child's birth. In January 2020, Child was adjudicated dependent.

In May 2021, DHS filed petitions to terminate Father's parental rights and to change Child's permanency goal to adoption.[1] The trial court held a hearing, where Father, Mother, and the CUA case manager, Nicole Edwards-Shaw, testified.[2] Edwards-Shaw testified that she had been the case manager for Child for 18 months. N.T., 9/27/2021, at 4. She testified that DHS became involved because Child tested positive for controlled substances at birth, and Mother left the hospital before Child was discharged. *Id.* She testified that the concerns that brought Child into care were drug abuse, housing, and lack of appropriate care for Child. *Id.* at 6. Edwards-Shaw testified that Child has been in the same foster home since her initial placement, and she was doing very well in care. *Id.* at 6-7. She stated that the resource parent was "very resourceful as far as making sure that [Child] gets everything as far as the therapy [and services] she needs." *Id.* at 7.

Edwards-Shaw testified Father's single case plan objectives were "[h]ousing, employment, parenting, random drug testing, visitation, and evaluation through [the Clinical Evaluation Unit ("CEU")]." *Id.* She stated he

---

[1] DHS also filed a petition to terminate Mother's parental rights to Child. The trial court granted the petition. Mother did not file an appeal.

[2] The trial court appointed Maureen F. Pie, Esq. as guardian ad litem ("GAL") for Child for proceedings related to dependency, termination of parental rights, adoption and/or custody, and the GAL appeared at the hearing on the termination of parental rights. *See* Order Appointing Counsel, dated Dec. 5, 2019; N.T., 9/27/21.

completed housing, parenting, and employment classes. *Id.* at 8. He also completed his CEU evaluation, and they did not recommend further treatment. *Id.* She agreed that drug and alcohol abuse had not been a major issue for Father and that he had completed random drug screens, with no issues. *Id.*

She testified that Father lives in a rooming house and that the accommodations are not appropriate for Child. *Id.* at 9. She testified she offered to help Father look for housing, looked at apartments for him, gave him information on apartments, and offered to help him with the first and last month rent and security deposit. *Id.* at 9-10. She had also spoken to Father about shelters, but he had not enrolled. *Id.* at 10. Edwards-Shaw testified that Father told her that he was actively looking for apartments, he had friends with leads that fell through, and the apartments they looked at were not in his budget. *Id.* She testified that she "very often" had conversations with Father about why it was important for him to obtain new housing. *Id.* at 11. She stated that the only explanation she had for his failure to find new housing was "lack of looking." *Id.*

Edwards-Shaw testified that Father had been working under the table for the person he paid to rent the room, and he told her that he did not have much money after paying for the room. *Id.* at 10, 12. Starting in May 2021, Father was employed with a waste company in Norristown, but he had been out of work for about a month due to an injury. *Id.* at 10, 12.

Edwards-Shaw also testified regarding Father's visitation with Child. She stated he "was very consistent with visits once [the CUA] was able to reach

him up until COVID." *Id.* at 13. During the beginning of the COVID pandemic, they offered virtual visits and offered to get him a tablet through the city so he could have the visits. *Id.* Father did not accept the tablet because he did not want to be responsible for it. *Id.* Further, his phone was not capable of doing virtual visits. *Id.* Therefore, his visits with Child occurred about once per month. When in-person visits resumed, Father did not attend. *Id.* He told Edwards-Shaw that his work schedule did not allow time for the visits. *Id.* The CUA again offered virtual visits, and of six offered, Father attended three. *Id.* Father did not progress beyond supervised visits, as he did not have a stable place to take Child and, although they were going to attempt community visits, Father did not get back to the CUA. *Id.* at 14. She further testified that during the visits "there is not much of a connection," and Father is sometimes at work during virtual visits, so he is "a little distracted." *Id.* at 15.

Edwards-Shaw was concerned that Father would not be able to provide safety for Child. *Id.* at 16. She stated he was able to care for himself, but not Child "at this time due to housing, due to his financial status, also due to not having support with him here." *Id.* She further testified that Child had a lot of doctor and specialist appointments, and she did not believe Father would be able to get Child to the appointments. *Id.* Edwards-Shaw testified that she informed Father of medical appointments, but he "has stressed since the beginning that his work schedule is not conducive." *Id.* at 29. Father never asked to attend the medical appointments. *Id.* at 50.

Edwards-Shaw stated Child had been at her current home since birth and the resource parent has been excelling in caring for her, noting the resource parent advocates for Child, ensures Child attends all her appointments, and Child was very attached to the resource parent. *Id.* at 21-22. Edwards-Shaw stated that prior to COVID, Father held Child and played with and talked to Child, but there were some things he was not comfortable doing. She would not describe the bond between Father and Child as a parent-child bond. *Id.* at 25. Edwards-Shaw did not think Child would suffer permanent emotional harm if Father's rights were terminated and believed that termination would be in Child's best interests. *Id.* at 21.

Father testified that when Child was born, he and Mother were in a relationship and living together. *Id.* at 58. He testified that he did not know of Mother's substance abuse issues. *Id.* He knew that Mother had a baby she left at the hospital. *Id.* He had been at the rooming house for seven years and had been working at a furniture store for 14 years. *Id.* He testified that he was paid under the table at the furniture store and, after he paid rent, he had about $50 per month left. *Id.* at 60-61. He testified that in June 2021 he started working for a waste management company. *Id.* at 62. He further testified that in March 2020 he became blind in one eye due to glaucoma. *Id.* at 64.

Father agreed that he did not want to take the tablet for virtual visits because he "didn't want to take the responsibility if it [got] broken or stolen." *Id.* at 65. He testified he did not ask whether he could go to doctor

appointments because he "had a feeling that [he would not be able to] go because of this COVID." *Id.* at 66-67. Father testified he made five of the six visits from April to August of 2021. *Id.* at 67. At the waste company, he was making $600 per week and would now be able to afford more in rent. *Id.* at 69-70. Father testified that he and Mother are no longer in a relationship, and they stopped living together in July 2021. *Id.* at 70-71.

Father stated that he and Child had "a bond because [he] sat there and h[e]ld her" and watched movies on his phone and she fell asleep in his arms. *Id.* at 71. He stated he would be willing to get training on how to care for Child's special needs. *Id.* at 71-72.

The trial court found DHS proved by clear and convincing evidence that Father's parental rights should be terminated under Section 2511(a)(1) and (2) and Section 2511(b) of the Adoption Act and changed Child's goal to adoption. Father filed a notice of appeal from both orders. The appeals have been consolidated.

Father raises the following issues:

> 1. Whether the trial court committed error by involuntarily terminating [F]ather R.W.'s parental rights where such determination was not supported by clear and convincing evidence establishing grounds for termination under the Adoption Act, 23 Pa. C.S.A. §§2511 (a)(1), (a)(2), (a)(5) and (a)(8)?[3]

---

[3] DHS petitioned for termination under Section 2511(a)(1), (2), (5), and (8). The trial court, however, terminated Father's parental rights under only Sections 2511(a)(1) and (2).

- 6 -

2. Whether the trial court committed error by changing the child A.S.'s permanency goal from reunification with the parent to adoption without giving primary consideration to the developmental, physical and emotional needs and welfare of the child as required by the Adoption Act, 23 Pa. C.S.A. §2511(b)?

Father's Br. at 9.

When we review termination of parental rights cases, "[w]e accept the findings of fact and credibility determinations of the trial court if the record supports them." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *Id.* We may reverse a trial court decision "for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. *See In re Adoption of K.C.*, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under Section 2511, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*Id.* (citations omitted). To affirm, "we need only agree with [the trial court's] decision as to any one subsection" of 2511(a), as well as its decision as to Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we conclude that the trial court properly terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b).

Father first maintains the trial court erred in terminating his parental rights under Section 2511(a). He noted that DHS had had prior involvement with Mother, whose parental rights to another child were terminated, and that DHS "assumed similar issues existed as to [Father] like substance abuse, mental health disorder and transience." Father's Br. at 20. However, he had no substance abuse or mental health disorders, and his only "tangible objective" was to secure adequate housing. *Id.* He pointed out he had full time employment, where he earned $2,500 per month, until he was injured, and that he would return to the employment when healed.

He also claims the CUA did not offer "the necessary reasonable assistance or services" required to secure adequate housing or alternate employment. *Id.* He states that he was involved with Child and "always maintained that he wanted to have [Child] return to his care." *Id.* Father

- 8 -

maintains that at the time of the hearing he was in the process of securing proper housing for him and Child. He claims DHS failed to offer reasonable services and assistance to help him achieve the objectives.[4]

Section 2511(a)(2) provides:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Section 2511(a)(2) requires the moving party to produce clear and convincing evidence of three elements: (1) the parent's repeated and continued incapacity, abuse, neglect or refusal to discharge parental duties; "(2) such incapacity, abuse, neglect or refusal has caused the child to be

_____

[4] Father maintains that because of the COVID-19 pandemic, "[the] Philadelphia Courts and its services, testing facilities and the businesses and services of virtually all enterprises were effectively shut down," which "made it impossible for [F]ather to be able to receive in person services or comply with being able to be drug screened by the court[.]" Father's Br. at 24. He claims that the "[a]lleged lack of [his] compliance in meeting his SCP parental objective during this time should not be held against [Father]." *Id.* However, Father completed his courses and the CUA reported no issues with substance abuse. Father does not explain how the pandemic hindered his ability to find new housing or attend virtual visits with Child.

without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa.Super. 2003).

The trial court concluded DHS established by clear and convincing evidence that termination was proper under Section 2511(a)(2), noting Father was unable to provide care and control for Child and unable to remedy the conditions that brought Child into care:

> The record and testimony presented at the September 27, 2021 Termination Hearing demonstrated Father's ongoing inability to provide care for or control of the Child. His failure to remedy the conditions that brought the Child into care indicated a continuing disregard of his parental duties. Specifically, Father failed to provide suitable housing for his Child nor did he visit his Child on a regular basis. Furthermore, the Child and her foster parent shared a parental bond and the foster parent was providing for the Child's daily emotional and physical needs. The Child's physical needs were great in that Child required many doctor visits and speech therapy. The trial court found that Father lacked the capacity to address his Child's basic emotional and physical needs. . . .

> At the September 27, 2021 Hearing, the CUA Manager, Ms. Nicole Edwards Shaw, testified that the Child was two years old and that she had been the CUA Manager of the Child's case for eighteen (18) months and that Child had been in foster care her entire life. Ms. Shaw testified that Child had been placed in care due to inappropriate housing. Ms. Shaw testified that Father's Single Case Plan ("SCP") objectives included obtaining stable housing and visitation with his Child. Ms. Shaw testified Father continued to live in a rooming house and that his housing remained inappropriate. Ms. Shaw testified that Father was inconsistent with visitation and that Father never progressed to [un]supervised visits.

. . .

> Ms. Shaw testified that Child had many doctors appointments and that Father never inquired about the medical appointments. Based upon the testimony at the Termination of Parental Rights Hearing as well as the documents in evidence, the trial court found clear and convincing evidence to terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) (2) as Father was unable to remedy the conditions that brought the Child into care.

Trial Court Opinion, filed Dec. 22, 2021, at 4-6 ("1925(a) Op.") (internal citations and footnote omitted).

The record supports the trial court's findings and it did not abuse its discretion in concluding termination was proper under Section 2511(a)(2). Father resided in a rooming house when Child was born. DHS repeatedly informed him that the house was not suitable for Child. Father agrees with this yet continues to reside at the rooming house. Although Father claims he will soon have a new home, he had not yet secured new housing. Father's claims that the CUA did not provide him reasonable assistance lack merit. Edwards-Shaw testified that she had many conversations with Father regarding housing, looked at apartments for him, sent him listings, and offered to help pay for the first and last month rent and security deposit. The court evidently credited this testimony.

In addition, Father was inconsistent with visitation, even declining the offer of a tablet from which to conduct virtual visits. That Father did not have substance abuse issues and completed required classes does not alter the facts that he failed to acquire appropriate housing and did not consistently

attend visits. The court did not commit an error of law or abuse of discretion in finding that the incapacity or refusal that caused Child to be without essential parental care, control or subsistence continued to exist and could not or would not be remedied.

Father next maintains DHS failed to present clear and convincing evidence that termination best served the needs and welfare of Child. He notes that Father testified that he had a bond with Child and wanted to be reunited with her. He claims DHS "only presented minimal scant information on this critical issue from the non-expert, non-psychological, non-therapeutic testimony of its social worker who is unqualified to give such opinion as a lay person witness as to the parental bond and the impact, damage and harm that severing [F]ather's rights may have on [C]hild." Father's Br. at 32-33.[5]

Under Section 2511(b), the court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the child's best interest. *See* 23 Pa.C.S.A.

_____

[5] Father's issue presented states the trial court erred "by changing [Child's] permanency goal from reunification with the parent to adoption without giving primary consideration to the developmental, physical, and emotional needs and welfare of [C]hild as required by the Adoption Act, 23 Pa.C.S.A. § 2511(b)[.]" Father's Br. at 9. The argument section focuses on Section 2511(b), which provides that when terminating parental rights, courts must "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). He provides no argument involving the goal change order, which was issued under the Juvenile Act. *See* 42 Pa.C.S.A. § 6351(f)(4) (at permanency hearing, courts must consider the "appropriateness and feasibility of the current placement goal for the child"). He has therefore waived any claim the court erred in changing Child's goal to adoption.

§ 2511(b). The focus under Section 2511(b) is not on the parent, but on the child. *See In re Adoption of R.J.S.*, 901 A.2d 502, 514 (Pa.Super. 2006). This inquiry involves "[i]ntangibles such as love, comfort, security, and stability . . . ." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* Importantly, "[t]he mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). Rather, the trial court "must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." *Id.* (internal quotation marks and citation omitted). Further, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). When assessing the bond, the "court is not required to use expert testimony." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010). Rather, a court may rely upon the observations and evaluations of social workers. *Id.*

The trial court concluded DHS established by clear and convincing evidence that termination was proper under Section 2511(b):

> Ms. Shaw testified that she had observed Child with her foster parent, and she testified that the Child had a bond with her foster parent and that there would be no irreparable harm to the Child if she were separated from [Father]. Ms. Shaw testified that it was in Child's best interests that Child

remain with her foster parent. It was clear to the trial court from the testimony that a parental/child bond existed.

. . .

The Court concluded that there existed a bond between the Child and her foster parent. Consequently, the termination of the Father's parental rights would be in the best interest of the Child pursuant to 23 Pa.C.S.A. 2511(b). Additionally, termination of parental rights would not have a detrimental effect on the developmental, physical and emotional needs of the Child.

1925(a) Op. at 6.

The record supports the trial court's findings and it did not commit an error or law or abuse its discretion in finding termination proper under Section 2511(b). Contrary to Father's contention, expert testimony is not required when determining whether a bond exists. *In re Z.P.*, 994 A.2d at 1121. Here, Edwards-Shaw testified regarding Child's interactions with both the foster parent and Father and testified that Child had a parental bond with foster parent, but not with Father. She further testified that termination of the parental rights would not have a detrimental effect on the developmental, physical, and emotional needs of Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/14/2022